1

2  **AIKEN SCHENK HAWKINS & RICCIARDI P.C.**
   **4742 North 24ᵗʰ St., Suite 100**
3  **Phoenix, Arizona 85016**
   **Telephone: (602) 248-8203**
4  **Facsimile: (602) 248-8840**
   **E-Mail: dlh@ashrlaw.com**
5  **D. Lamar Hawkins – 013251**
   Attorneys for Debtors

6

7                    IN THE UNITED STATES BANKRUPTCY COURT

8                        FOR THE DISTRICT OF ARIZONA

9

10  In re:                                  | Chapter 11 Proceedings

11  GREGORY LOUIS WELDON and NICOLE         | Case No. 2:08-bk-12336-SSC
    ANN WELDON,

12                    Debtors.              | **DEBTORS' FIRST PLAN OF**
                                            | **REORGANIZATION**
13  Address:   P.O. Box 12696

14                        Scottsdale, AZ 85086

15  Social Security Nos.: xxx-xx-8799
                          xxx-xx-0152

16

17

18         Gregory Louis Weldon and Nicole Ann Weldon (the "Debtors"), debtors-in-possession in

19  the above-captioned bankruptcy estate, submit to the Court and creditors of the Debtors' estate the

20  following Plan of Reorganization (the "Plan"), pursuant to §1121(a) of the Bankruptcy Code.

21  **I.    DEFINITIONS**

22         For purposes of this Plan, except as expressly provided or unless the context otherwise

23  requires, all capitalized terms not otherwise defined have the meanings ascribed to them in Section I

24  of the Plan.   Any term used in the Plan that is not defined in the Plan but is defined in the

25  Bankruptcy Code or the Bankruptcy Rules retains the meaning ascribed to such term in the

26  Bankruptcy Code or the Bankruptcy Rules.   Whenever the context requires, such terms include the

27  plural as well as the singular, the masculine gender includes the feminine gender, and the feminine

28  gender includes the masculine gender.

           As used in this Plan, the following terms have the meanings specified below:

S:\Weldon.G\2814701\Pleadings\Plan.doc

28th Drive Property: The real property located at 7106 N. 28th Drive, Phoenix, Maricopa County, Arizona.

28th Street Property: The real property located at 4327 N. 28th Street, #108, Phoenix, Maricopa County, Arizona.

39th Street Property: The real property located at 1915 S. 39th Street, #113, Mesa, Maricopa County, Arizona.

63rd Street Property: The real property located at 33520 N. 63rd Street, Cave Creek, Maricopa County, Arizona.

70th Street Property: The real property located at 298XX N. 70th Street, Scottsdale, Maricopa County, Arizona, Parcel No. 216-67-116-B.

Administrative Claim: A Claim for payment of an administrative expense of a kind specified in 11 U.S.C. §§ 503(b) or 1114(e)(2) and entitled to priority pursuant to Code § 507(a)(2), including, but not limited to, (a) the actual, necessary costs and expenses, incurred after the Petition Date, of preserving the bankruptcy estate and operating the Debtor's business, (b) all Allowed Claims of professionals appointed by the Bankruptcy Court, (c) all fees and charges assessed against the bankruptcy estate under 28 U.S.C. § 1930, and (d) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under Code § 546(c)(2).

ADOR: The Arizona Department of Revenue.

Allowed Claim: Allowed Claim shall mean a Claim:

(a) with respect to which a proof of claim has been filed with the Court within the applicable period of limitation fixed by Rule 3003 of the Rules of Bankruptcy Procedure and to which no objection to the allowance of the Claim has been filed by the Debtors or any other party or as to which any such objection has been determined by an order or judgment of the Court which is no longer subject to appeal and to which no appeal is pending, or

(b) Scheduled in the list of creditors prepared and filed with the Court pursuant to Rule 1007(b), Rules of Bankruptcy Procedure, and not listed as disputed, contingent or un-liquidated as to the amount.

An Allowed Claim shall not include un-matured or post-petition interest, penalties, fees or costs, unless specifically stated in the Plan. Notwithstanding §502(a) of the Code and Rules 3001 and 3003, for the purposes of the Plan, a Claim shall not be an Allowed Claim unless it satisfies the definition of Allowed Claim under this Plan.

Allowed Interest:  An Allowed Interest shall mean an Interest in the Debtors held by a person or entity, as of the Effective Date, and as to which Interest no objection has been made within the time allowed for the making of objections, or as to which such Interest is allowed by a final order, or an Interest as to which a timely and proper proof of interest has been filed, and as to which proof of interest no objection has been made within the time allowed for making objections.

Allowed Priority Claim: The Allowed Claim of a Claimant that is entitled to priority in payment under 11 U.S.C. §507(a)(2) through (a)(8).

Allowed Secured Claim: An Allowed Claim to the extent that such Allowed Claim is secured by a lien which is unavoidable, on property in which the estate has an interest, to the extent of the value of such Creditor's interest in the estate's interest in such property as determined in light of the purpose of the valuation and of the proposed disposition and use of such property and determined as of the Petition Date.

Allowed Unsecured Claim: An Allowed Claim to the extent that such Allowed Claim is not secured by a lien on property in which the estate has an interest.

Ballot:  Each of the ballot forms distributed with the Disclosure Statement to holders of Impaired Claims entitled to vote as specified in this Plan in connection with the solicitation of acceptances of this Plan.

Bankruptcy Code: 11 U.S.C. §101 et seq.

Bankruptcy Court: The United States Bankruptcy Court for the District of Arizona or any other court which may have jurisdiction over this case or any proceeding arising under, in, or relating to this case.

Bankruptcy Rule:  The Federal Rules of Bankruptcy Procedure as amended and the Local Rules of the Bankruptcy Court, as applicable to the Chapter 11 Case or proceedings therein, as the case may be.

**Bar Date:** The date, if any, designated by the Bankruptcy Court as the last date for filing Proofs of Claim or Interest against the Debtors.

**Big Oak Property:** The real property located at 2526 W. Big Oak Street, Phoenix, Maricopa County, Arizona.

**Blackhawk Property:** The real property located at 3304 E. Blackhawk, Phoenix, Maricopa County, Arizona.

**Celestial Property:** The real property located at 10450 E. Celestial Drive, Scottsdale, Maricopa County, Arizona, Parcel No. 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.

**Chapter 11:** Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §1101, et seq.

**Claim:** (a) a right to payment, whether or not such right is reduced to judgment, liquidated, un-liquidated, fixed, contingent, matured, un-matured, disputed, undisputed, legal, equitable, secured or unsecured, which right arose or accrued prior to the date of Confirmation, or; (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, un-matured, disputed, undisputed, secured, or unsecured, where such right arose or accrued prior to Confirmation, or; (c) a claim arising under 11 U.S.C. §502(g).

**Claimant or Creditor:** Any person or entity that asserts a Claim.

**Class:** A category of holders of Claims or Interests as described in this Plan.

**Confirmation:** The signing by the Court of the Confirmation Order.

**Confirmation Date:** The date upon which the Confirmation Order is entered upon the docket.

**Confirmation Hearing:** The hearing held by the Bankruptcy Court regarding confirmation of the Plan, as it may be continued from time to time.

**Confirmation Order:** The Order signed by the Bankruptcy Court pursuant to 11 U.S.C. §1129 confirming this Plan.

**Contingent Claim:** Any Claim for which a proof of claim has been filed with the Bankruptcy Court: (a) which was not filed in a sum certain, or which has not accrued and is dependent on a future event that has not occurred and may never occur, and (b) which has not been allowed on or before the Confirmation Date.

1

2       <u>Court</u>: The United States Bankruptcy Court for the District of Arizona, which has

3 jurisdiction in this case.

4       <u>Debtors</u>: Gregory Louis Weldon and Nicole Ann Weldon.

5       <u>Disbursing Agent</u>: The Reorganized Debtors shall be the Disbursing Agent and shall make

6 distributions to holders of Allowed Claims under the Plan.

7       <u>Disclosure Statement</u>: The Debtors' disclosure statement and any amendments and

8 supplements thereto as approved by an order of the Bankruptcy Court.

9       <u>Disputed Claim</u>: A Claim which the Debtors listed as un-liquidated, disputed or contingent

10 in its Schedules or to which an objection has been filed which has not been resolved by a final order

11 of the Bankruptcy Court.

12       <u>Effective Date</u>: 30 days after the Confirmation Date. If 30 days after the Confirmation Date

13 falls on a weekend or a holiday, the Effective Date will be the first business day thereafter.

14       <u>Excess Cash Flow</u>: Cash flow of the Debtors' post-petition income as reflected in the

15 Debtor's Schedule I, after deduction from their post-petition income all expenses as set forth in the

16 Debtors' Schedule J, and all payments to administrative and priority creditors.

17       <u>Final Order</u>: An order or judgment which has not been stayed.

18       <u>Impaired</u>: When used with reference to a Claim or Interest, a Claim or Interest that is

19 impaired within the meaning of Code § 1124.

20       <u>Insider</u>: A person or entity within the definition contained at § 101(31) of the Bankruptcy

21 Code.

22       <u>IRS</u>: The Internal Revenue Service.

23       <u>Interest</u>: Any equity interest in the Debtors as of the Effective Date.

24       <u>Interest Holder</u>: Any person or persons owning an Interest in the Debtors as of the Effective

25 Date.

26       <u>Lakeview Property</u>: The real property located at 150 N. Lakeview #24, Chandler, Maricopa

27 County, Arizona.

28       <u>New Obligations</u>: Those debts of the Debtors which existed pre-confirmation, but which are

modified by the confirmed Plan resulting in the creation of a new note. The obligations for which

the Reorganized Debtors have liability under the terms of the confirmed Plan. Said new obligations shall not be considered in default unless and until the Reorganized Debtors default on said obligations after the Effective Date.

Oversecured: The term describing the Allowed Claim of a secured Creditor when the value of the collateral securing said Allowed Claim exceeds the amount of the debt serving as the basis for said Allowed Claim.

Person: Any individual, corporation, partnership, joint venture, association, joint stock company, trust, unincorporated association or organization, governmental agency, or associated political subdivision.

Petition: The original petition under Chapter 11.

Petition Date: The date on which the Petition was filed, September 16, 2008.

Plan: This Plan of Reorganization and any amendments or supplements thereto.

Plan Rate: The rate of interest referred to in the Plan which is the prime rate.

Proof of Claim: The proof of claim that must be filed by a holder of an Impaired Claim by the Bar Date.

Pro Rata: The ratio of an Allowed Claim or Allowed Interest in a particular Class to the aggregate amount of all Allowed Claims or Allowed Interests in that Class.

Reorganized Debtor: The Debtors after the Effective Date.

Residence: The real property located at 2613 W. Irvine Rd., Desert Hills, Maricopa County, Arizona.

Rio Verde Property: The real property located at 169 & Rio Verde Drive, Maricopa County, Arizona, Parcel No. 219-38-142-D.

Royal Palm Property: The real property located at 8651 E. Royal Palm Rd., C125, Scottsdale, Maricopa County, Arizona.

Roy Rogers Property: The real property located at 2226 W. Roy Rogers Rd., Phoenix, Maricopa County, Arizona.

Running Deer Property: The real property located at 2339 W. Running Deer, Phoenix, Maricopa County, Arizona.

Straight Arrow Property: The real property located at 2337 W. Straight Arrow Lane, Phoenix, Maricopa County, Arizona.

Tax Claim Rate: The rate of interest, to be determined by the Bankruptcy Court at the Confirmation Hearing, that, when applied to the amount of an Allowed Priority Claim to be paid in installments will result in such installments being of an aggregate value, as of the Effective Date, equal to the Allowed amount of such Claim, consistent with the requirements of 11 U.S.C. § 1129(a)(9). At the Confirmation Hearing, the Debtor will request the Court determine that the Tax Claim Rate is eight percent per annum.

Undersecured: The term describing the Allowed Claim of a secured Creditor when the value of the collateral securing said Allowed Claim is less than the debt which serves as the basis of said Allowed Claim.

Via Dona Property: The real property located at 28033 N. Via Dona, Phoenix, Maricopa County, Arizona.

Voting Deadline: The voting deadline for voting to accept or reject this Plan, as determined by the Bankruptcy Court.

White Feather Property: The real property located at 2446 W. White Feather Lane, Phoenix, Maricopa County, Arizona.

## II.   CLASSIFICATION OF CLAIMS AND INTERESTS.

### A.   Priority Claims: Class 1

Class 1-A consists of Allowed Priority Claims under 11 U.S.C. §507(a)(2) (Administrative Claims).

Class 1-B consists of Allowed Priority Claims under 11 U.S.C. §507(a)(7) (Tenant Claims).

Class 1-C consists of Allowed Priority Claims under 11 U.S.C. § 507(a)(8) (Tax Claims).

### B.   Secured Claims: Class 2

Class 2-A consists of the Allowed Secured Claim of Maricopa County Treasurer.

Class 2-B consists of the Allowed Secured Claim of GMAC Mortgage LLC ("GMAC") related to its first position lien on the real property located at 2613 W. Irvine Road, Desert Hills, Maricopa County, Arizona ("Residence").

Class 2-C consists of the Allowed Secured Claim of Chase Home Finance, LLC ("Chase") related to its second position lien on the Residence.

Class 2-D consists of the Allowed Secured Claim of IndyMac Federal Bank ("IndyMac") related to its first position lien on the real property located at 2446 W. White Feather Lane, Phoenix, Maricopa County, Arizona ("White Feather Property").

Class 2-E consists of the Allowed Secured Claim of CLC Consumer Services ("CLC") related to its second position lien on the White Feather Property.

Class 2-F consists of the Allowed Secured Claim of Dynamite Mountain Ranch HOA ("DMR") related to the homeowner's association fees owed on the White Feather Property.

Class 2-G consists of the Allowed Secured Claim of Wells Fargo Bank, N.A. ("Wells Fargo") related to its first position lien on the real property located at 150 N. Lakeview #24, Chandler, Maricopa County, Arizona ("Lakeview Property").

Class 2-H consists of the Allowed Secured Claim of Select Portfolio Servicing ("SPS") related to its second position lien on the Lakeview Property.

Class 2-I consists of the Allowed Secured Claim of Tuscan Springs HOA ("Tuscan Springs") related to the homeowner's association fees owed on the Lakeview Property.

Class 2-J consists of the Allowed Secured Claim of Aurora Loan Services LLC ("Aurora") related to its first position lien on the real property located at 8651 E. Royal Palm Rd., C125, Scottsdale, Maricopa County, Arizona ("Royal Palm Property").

Class 2-K consists of the Allowed Secured Claim of GMAC related to its second position lien on the Royal Palm Property.

Class 2-L consists of the Allowed Secured Claim of Villa De Vallarta related to homeowner's association fees owed on the Royal Palm Property.

Class 2-M consists of the Allowed Secured Claim of National City Mortgage Co. ("National City") related to the real property owed by Legacy Investing International #5, LLC for

its first position lien on the real property located at 1915 S. 39th Street #113, Mesa, Maricopa County, Arizona ("39th Street Property").

Class 2-N consists of the Allowed Secured Claim of Chase Home Finance, LLC ("Chase") related to its second position lien on the 39th Street Property, which is owned by Legacy Investing International #5, LLC.

Class 2-O consists of the Allowed Secured Claim of Vista Villages HOA ("Vista Villages") for homeowner's association fees owed on the 39th Street Property, which is owned by Legacy Investing International #5, LLC.

Class 2-P consists of the Allowed Secured Claim of GMAC Mortgage, LLC ("GMAC") related to its first position lien on the real property located at 4327 N. 28th Street #108, Phoenix, Maricopa County, Arizona ("28th Street Property").

Class 2-Q consists of the Allowed Secured Claim of GMAC Mortgage, LLC ("GMAC") related to its second position lien on the 28th Street Property.

Class 2-R consists of the Allowed Secured Claim of The Mews on Twenty-Eighth Street, Inc. ("The Mews") for homeowner's association fees owed on the 28th Street Property.

Class 2-S consists of the Allowed Secured Claim of Aurora Loan Services LLC ("Aurora") related to the real property owed by Legacy Investing International #4, LLC for its first position lien on the real property located at 3304 E. Blackhawk, Phoenix, Maricopa County, Arizona ("Blackhawk Property").

Class 2-T consists of the Allowed Secured Claim of Homecomings Financial, LLC ("Homecomings") related to its second position lien the Blackhawk Property, which is owned by Legacy Investing International #4, LLC.

Class 2-U consists of the Allowed Secured Claim of Springfield Park HOA for homeowner's association fees owed on the Blackhawk Property, which is owned by Legacy Investing International #4, LLC.

Class 2-V consists of the Allowed Secured Claim of The Bank of New York Mellon as servicing agent for EMC Mortgage Corporation ("EMC") related to its first position lien on the

real property located at 2226 W. Roy Rogers Rd., Phoenix, Maricopa County, Arizona ("Roy Rogers Property").

Class 2-W consists of the Allowed Secured Claim of EMC related to its second position lien the Roy Rogers Property.

Class 2-X consists of the Allowed Secured Claim of Dynamite Mountain Ranch HOA for homeowner's association fees owed on the Roy Rogers Property.

Class 2-Y consists of the Allowed Secured Claim of Central Mortgage Company ("CMC") related to its first position lien on the real property located at 7106 N. 28th Drive, Phoenix, Maricopa County, Arizona ("28th Drive Property").

Class 2-Z consists of the Allowed Secured Claim of GMAC Mortgage, LLC ("GMAC") related to it second position lien the 28th Drive Property.

Class 2-AA consists of the Allowed Secured Claim of Golden Keys HOA for homeowner's association fees owed on the 28th Drive Property.

Class 2-BB consists of the Allowed Secured Claim of Taylor Bean & Whitaker related to its first position lien on the real property located at 2337 W. Straight Arrow Lane, Phoenix, Arizona ("Straight Arrow Property").

Class-CC consists of the Allowed Secured Claim of Taylor Bean & Whitaker related to its second position lien on the Straight Arrow Property.

Class 2-DD consists of the Allowed Secured Claim of Dynamite Mountain Ranch HOA for homeowner's association fees owed on the Straight Arrow Property.

Class 2-EE consists of the Allowed Secured Claim of EMC for its first position lien on the real property located at 28033 N. Via Dona, Phoenix, Arizona ("Via Dona Property").

Class 2-FF consists of the Allowed Secured Claim of Taylor Bean & Whitaker related to its second position lien on the Via Dona Property.

Class 2-GG consists of the Allowed Secured Claim of Dynamite Mountain Ranch HOA for homeowner's association fees owed on the Via Dona Property.

1

2    Class 2-HH consists of the Allowed Secured Claim of America's Servicing

3    Company ("ASC") related to its first position lien on the real property located at 2526 W. Big Oak

4    Street, Phoenix, Arizona ("Big Oak Property").

5    Class 2-II consists of the Allowed Secured Claim of Ocwen related to its second

6    position lien on the Big Oak Property.

7    Class 2-JJ consists of the Allowed Secured Claim of Dynamite Mountain Ranch

8    HOA for homeowner's association fees owed on the Big Oak Property.

9    Class 2-KK consists of the Allowed Secured Claim of EMC related to its first

10   position lien on the real property located at 2339 W. Running Deer, Phoenix, Arizona ("Running

11   Deer Property").

12   Class 2-LL consists of the Allowed Secured Claim of EMC related to its second

13   position lien on the Running Deer Property.

14   Class 2-MM consists of the Allowed Secured Claim of Dynamite Mountain Ranch

15   HOA for homeowner's association fees owed on the Running Deer Property.

16   Class 2-NN consists of the Allowed Secured Claim of M&I Marshall & Ilsley Bank

17   ("M&I") related to the real property owned by Legacy Investing International #10, LLC for its first

18   position lien on the real property located at 298XX N. 70th Street, Scottsdale, Arizona ("70th Street

19   Property").

20   Class 2-OO consists of the Allowed Secured Claim of M&I related to the real

21   property owed by Legacy Investing International #9, LLC for its first position lien on the real

22   property located at 10450 E. Celestial Drive, Scottsdale, Arizona ("Celestial Property").

23   Class 2-PP consists of the Allowed Secured Claim of Desert Mountain Master

24   Association for homeowner's association fees owed on the Celestial Property, which is owned by

25   Legacy Investing International #9, LLC.

26   Class 2-QQ consists of the Allowed Secured Claim of First Credit Union related to

27   its first position lien on the real property located at 169 & Rio Verde Drive, Parcel No. 219-38-142-

28   D ("Rio Verde Property").

Class 2-RR consists of the Allowed Secured Claim of National City Mortgage related to its first position lien on the real property located at 33520 N. 63rd Street, Cave Creek, Maricopa County, Arizona ("63rd Street Property").

Class 2-SS consists of the Allowed Secured Claim of Countrywide related to its second position lien on the 63rd Street Property.

Class 2-TT consists of the Allowed Secured Claim of American Honda Finance related to its lien on the 2004 Honda Pilot.

Class 2-UU consists of the Allowed Secured Claim of USAA Federal Savings Bank related to its lien on the 2002 BMW.

**C.    General Unsecured Claims: Class 3**

Class 3-A consists of the Allowed Unsecured Claims of Creditors of the Debtors.

**D.    Debtors' Interest: Class 4**

Class 4-A consists of the Allowed Interest of the Debtors.

## III.    IMPAIRMENT OF CLASSES

Class 1-A, 1-B, 1-C, 2-B, 2-C, 2-D, 2-E, 2-F, 2-G, 2-H, 2-I, 2-J, 2-K, 2-L, 2-M, 2-N, 2-O, 2-P, 2-Q, 2-R, 2-S, 2-T, 2-U, 2-W, 2-X, 2-Y, 2-Z, 2-AA, 2-BB, 2-CC, 2-DD, 2-EE, 2-FF, 2-GG, 2-HH, 2-II, 2-JJ, 2-KK, 2-LL, 2-MM, 2-PP, 2-RR, and 2-SS are unimpaired under the Plan. All other classes are impaired, as that term is defined in 11 U.S.C. § 1124.

## IV.    TREATMENT OF CLASSES

**A.    Priority Claims: Class 1**

**1.    Administrative Claims: 1-A**

This Class consists of Allowed Priority Claims under 11 U.S.C. § 507(a)(2) (Administrative Claims) related to the Debtors. Unless they agree to an alternative form of treatment, the Allowed Claims of Class 1-A shall be paid in full, in cash, by the earlier of the Effective Date or the date that such are allowed and ordered paid by the Court. Any Class 1-A Claim not allowed as of the Effective Date shall be paid as soon thereafter as they are allowed by the Court according to the terms of this Class. The Allowed Administrative Claim of counsel for

the Debtors that has not been paid as of the Effective Date, shall be paid in monthly payments of principal and interest, with interest at 8%, until paid in full.

### 2. Tenant Claims: 1-B

Class 1-B consists of Allowed Priority Claims under 11 U.S.C. §507(a)(7) relating to tenant security deposits, which includes: unsecured claims of individuals, to the extent of $2,425 for each such individual, arising from the deposit, before the commencement of the case, of money in connection with the purchase, lease, or rental of property...for the personal, family, or household use of such individuals, that were not delivered or provided.

To the extent that any tenant has provided the Debtors a deposit relating to the lease of any real property that falls within the $2,425.00 debt limitations, the tenant's deposit rights shall be preserved. All houses are to be surrendered to the lenders to allow them to foreclose on their interest in the house, and as such, the lender receiving ownership of the house shall resolve the tenant deposit with the tenant. Any deposit that exceeds the $2,425.00 dollar limitation or definitional limitations set forth in 11 U.S.C. §507(a)(7) shall be treated as a general unsecured claim under Class 3-A.

### 3. Tax Claims: 1-C

Class 1-C consists of Allowed Priority Claims under 11 U.S.C. §507(a)(8)-tax claims of the Debtors. As provided in 11 U.S.C. §1129(a)(9)(C), unless they agree to an alternative form of treatment, the Allowed Priority Claims of Class 1-C shall be paid in full, in cash, in regular installment payments of a total value, as of the Effective Date of the Plan, equal to the Allowed Priority Claim, over a period ending five (5) years after the Petition Date, and in a manner that is not less favorable than the most favored non-priority unsecured claim provided for by the Plan (other than cash payments made to a class of creditors under §1122(b)). Any Allowed Priority Claims will receive interest at the Tax Claim Rate. Any Class 1-C Claim not allowed as of the Effective Date shall be paid as soon thereafter as they are allowed by the Court according to the terms of this Class.

The Internal Revenue Service ("IRS") filed a proof of claim in the amount of $343,994.36 for its priority claim and $55,285.26 for penaties for 2005, 2006, and 2007 income tax

liability. The Debtors are in the process of filing amended tax returns. To the extent there is a dispute between the Debtors and the IRS as to the amount of the IRS's priority claim, the Debtors will file an objection to the proof of claim.

The Arizona Department of Revenue ("ADOR") filed a proof of claim reflecting a priority tax liability in the amount of $4,782.00. The Debtors are in the process of filing amended tax returns. To the extent there is a dispute between the Debtors and the ADOR as to the amount of the ADOR's priority claim, the Debtors will file an objection to the proof of claim.

**B.    Secured Claims: Class 2**

**1.    Maricopa County: Class 2-A**

This Class consists of the Allowed Secured Claim held by Maricopa County for real property taxes owing on the Debtors' Residence, White Feather Property, Lakeview Property, Royal Palm Property, 39th Street Property, 28th Street property, Blackhawk Property, Roy Rogers Property, 28th Drive Property, Straight Arrow Property, Via Dona Property, Big Oak Property, Running Deer Property, 70th Street Property, Celestial Property, Rio Verde Property and 63rd Street Property as of the Effective Date.

The secured creditors on all houses are being given the right to foreclose their interest on these houses. Maricopa County's lien will remain on the property and paid by the lender that forecloses on the property, with any accrued interest.

The Debtors and the lenders on the lots have reached a resolution as to the treatment of their claims as set forth herein. Maricopa County be treated on the lots as follows:

(a) If the Debtors retain any of the lots, all real property taxes that became due prior to the Effective Date on any retained lots which were not paid as of the Effective Date, shall be paid in equal monthly installments over a period of six (6) months from the Effective Date. All real property taxes that became due prior to the Effective Date shall bear interest at the rate of 7% from the date the taxes became due. The Reorganized Debtors shall pay any real property taxes which accrue and become due after the Effective Date as said amounts become due and payable pursuant to State law. The Reorganized Debtors may prepay any of these Allowed Secured Claims at any time without penalty. Maricopa County will retain its lien on the lot until paid in full.

(b) If the lender forecloses on the lot, the real property taxes will be paid by the lender that forecloses on the lot, with any accrued interest.

### 2. **GMAC: Class 2-B**

This Class consists of the Allowed Secured Claim held by GMAC Mortgage LLC ("GMAC"), which is secured by a first position interest in the Residence. GMAC filed a secured proof of claim in the amount of $412,793.82. The Debtors estimated the value of their Residence in their Schedules at $700,000. The Debtors anticipate that they will reach a stipulation with GMAC to lift the stay and allow GMAC to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from GMAC's Claim shall be treated in accordance with Class 3-A. If GMAC so chooses, the Debtors will execute for GMAC's benefit a deed in lieu of foreclosure transferring the Residence to GMAC.

### 3. **Chase: Class 2-C**

This Class consists of the Allowed Secured Claim held by Chase Home Finance, LLC ("Chase"), which is secured by a second position interest in the Residence. The Debtors anticipate that this Allowed Secured Claim will be allowed in the approximate amount of $204,059.00. The Debtors estimated the value of their Residence in their Schedules at $700,000. The Debtors anticipate that they will reach a stipulation with Chase to lift the stay and allow Chase to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from Chase's Claim shall be treated in accordance with Class 3-A. If Chase so chooses, the Debtors will execute for Chase's benefit a deed in lieu of foreclosure transferring the Residence to Chase.

### 4. **IndyMac: Class 2-D**

This Class consists of the Allowed Secured Claim held by IndyMac Federal Bank ("IndyMac"), which is secured by a first position interest in the White Feather Property. IndyMac filed a Secured Proof of Claim in the amount of $213,736.47. The Debtors estimated the value of the White Feather Property in their Schedules at $175,000. The Debtors anticipate that they

will reach a stipulation with IndyMac to lift the stay and allow IndyMac to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from IndyMac's Claim shall be treated in accordance with Class 3-A. If IndyMac so chooses, the Debtors will execute for IndyMac's benefit a deed in lieu of foreclosure transferring the White Feather Property to IndyMac.

### 5. **CLC: Class 2-E**

This Class consists of the Allowed Secured Claim held by CLC Consumer Services ("CLC"), which is secured by a second position interest in the White Feather Property. CLC filed a Secured Proof of Claim in the amount of $123,468.48. The Debtors estimated the value of the White Feather Property in their Schedules at $175,000. The Debtors anticipate that they will reach a stipulation with CLC to lift the stay and allow CLC to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from CLC's Claim shall be treated in accordance with Class 3-A. If CLC so chooses, the Debtors will execute for CLC's benefit a deed in lieu of foreclosure transferring the White Feather Property to CLC.

### 6. **DMR: Class 2-F**

This Class consists of the Allowed Secured Claims held by Dynamite Mountain Ranch ("DMR") that is secured by a homeowner's association lien on the White Feather Property. DMR filed a secured proof of claim in the amount of $585.00. The Debtors anticipate that they will reach a stipulation with DMR to lift the stay and allow DMR to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from DMR's Claim shall be treated in accordance with Class 3-A.

### 7. **Wells Fargo: Class 2-G**

This Class consists of the Allowed Secured Claim held by Wells Fargo Bank, N.A. ("Wells Fargo"), which is secured by a first position interest in the Lakeview Property. Wells

S:\Weldon.G\2814701\Pleadings\Plan.doc

16

Fargo filed a Secured Proof of Claim in the amount of $283,450.00. The Debtors estimated the value of the Lakeview Property in their Schedules at $280,000. The Debtors anticipate that they will reach a stipulation with Wells Fargo to lift the stay and allow Wells Fargo to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from Wells Fargo's Claim shall be treated in accordance with Class 3-A. If Wells Fargo so chooses, the Debtors will execute for Wells Fargo's benefit a deed in lieu of foreclosure transferring the Lakeview Property to Wells Fargo.

### 8. SPS: Class 2-H

This Class consists of the Allowed Secured Claim held by Select Portfolio Servicing ("SPS"), which is secured by a second position interest in the Lakeview Property. SPS filed a Secured Proof of Claim in the amount of $55,133.06. The Debtors estimated the value of the Lakeview Property in their Schedules at $280,000. The Debtors anticipate that they will reach a stipulation with SPS to lift the stay and allow SPS to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from SPS's Claim shall be treated in accordance with Class 3-A. If SPS so chooses, the Debtors will execute for SPS's benefit a deed in lieu of foreclosure transferring the Lakeview Property to SPS.

### 9. Tuscan Springs: Class 2-I

This Class consists of the Allowed Secured Claims held by Tuscan Springs HOA ("Tuscan Springs") that is secured by a homeowner's association lien on the Lakeview Property. Tuscan Springs filed a secured proof of claim in the amount of $2,559.00. The Debtors anticipate that they will reach a stipulation with Tuscan Springs to lift the stay and allow Tuscan Springs to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from Tuscan Springs's Claim shall be treated in accordance with Class 3-A.

### 10. Aurora: Class 2-J

This Class consists of the Allowed Secured Claim held by Aurora Loan Services LLC ("Aurora"), which is secured by a first position interest in the Royal Palm Property. Aurora filed a Secured Proof of Claim in the amount of $84,800.00. The Debtors estimated the value of the Royal Palm Property in their Schedules at $119,000. The Debtors anticipate that they will reach a stipulation with Aurora to lift the stay and allow Aurora to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from Aurora's Claim shall be treated in accordance with Class 3-A. If Aurora so chooses, the Debtors will execute for Aurora's benefit a deed in lieu of foreclosure transferring the Royal Palm Property to Aurora.

### 11.  GMAC:  Class 2-K

This Class consists of the Allowed Secured Claim held by GMAC, which is secured by a second position interest in the Royal Palm Property. GMAC filed a Secured Proof of Claim in the amount of $100,856.06. The Debtors estimated the value of the Royal Palm Property in their Schedules at $119,000. The Debtors anticipate that they will reach a stipulation with GMAC to lift the stay and allow GMAC to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from GMAC's Claim shall be treated in accordance with Class 3-A. If GMAC so chooses, the Debtors will execute for GMAC's benefit a deed in lieu of foreclosure transferring the Royal Palm Property to GMAC.

### 12.  Villa De Vallarta:  Class 2-L

This Class consists of the Allowed Secured Claims held by Villa De Vallarta that is secured by a homeowner's association lien on the Royal Palm Property. The Debtors anticipate that this Allowed Secured Claim will be allowed in the approximate amount of $1,460. The Debtors anticipate that they will reach a stipulation with VDV to lift the stay and allow VDV to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of

the Plan, the terms of the stipulation control. Any deficiency resulting from VDV's Claim shall be treated in accordance with Class 3-A.

### 13. National City: Class 2-M

This Class consists of the Allowed Secured Claim held by National City Mortgage Co. ("National City"), which is secured by a first position interest in the 39th Street Property. National City filed a Secured Proof of Claim in the amount of $118,577.17. The Debtors estimated the value of the 39th Street Property in their Schedules at $160,000. The Debtors anticipate that they will reach a stipulation with National City to lift the stay and allow National City to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from National City's Claim shall be treated in accordance with Class 3-A. If National City so chooses, the Debtors will execute for National City's benefit a deed in lieu of foreclosure transferring the 39th Street Property to National City.

### 14. Chase: Class 2-N

This Class consists of the Allowed Secured Claim held by Chase Home Finance, LLC ("Chase"), which is secured by a second position interest in the 39th Street Property. Chase filed a Secured Proof of Claim in the amount of $15,499.34. The Debtors anticipate that they will reach a stipulation with Chase to lift the stay and allow Chase to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from Chase's Claim shall be treated in accordance with Class 3-A. If Chase so chooses, the Debtors will execute for Chase's benefit a deed in lieu of foreclosure transferring the 39th Street Property to Chase.

### 15. Vista Villages: Class 2-O

This Class consists of the Allowed Secured Claims held by Vista Villages HOA ("Vista Villages") that is secured by a homeowner's association lien on the 39th Street Property. The Debtors anticipate that this Allowed Secured Claim will be allowed in the approximate amount of $571. The Debtors anticipate that they will reach a stipulation with Vista

Villages to lift the stay and allow Vista Villages to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from Vista Villages' Claim shall be treated in accordance with Class 3-A.

### 16. GMAC: Class 2-P

This Class consists of the Allowed Secured Claim held by GMAC Mortgage, LLC ("GMAC"), which is secured by a first position interest in the 28th Street Property. GMAC filed a Secured Proof of Claim in the amount of $109,841.87. The Debtors estimated the value of the 28th Street Property in their Schedules at $140,000. The Debtors anticipate that they will reach a stipulation with GMAC to lift the stay and allow GMAC to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from GMAC's Claim shall be treated in accordance with Class 3-A. If GMAC so chooses, the Debtors will execute for GMAC's benefit a deed in lieu of foreclosure transferring the 28th Street Property to GMAC.

### 17. GMAC: Class 2-Q

This Class consists of the Allowed Secured Claim held by GMAC Mortgage, LLC ("GMAC"), which is secured by a second position interest in the 28th Street Property. GMAC filed a Secured Proof of Claim in the amount of $85,956.95. The Debtors estimated the value of the 28th Street Property in their Schedules at $140,000. The Debtors anticipate that they will reach a stipulation with GMAC to lift the stay and allow GMAC to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from GMAC's Claim shall be treated in accordance with Class 3-A. If GMAC so chooses, the Debtors will execute for GMAC's benefit a deed in lieu of foreclosure transferring the 28th Street Property to GMAC.

### 18. The Mews: Class 2-R

This Class consists of the Allowed Secured Claims held by The Mews on Twenty-Eighth Street, Inc. ("The Mews") that is secured by a homeowner's association lien on the

28th Street Property. The Mews filed a secured proof of claim in the amount of $2,183.14. The Debtors anticipate that they will reach a stipulation with The Mews to lift the stay and allow The Mews to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from The Mew's Claim shall be treated in accordance with Class 3-A.

19. **Aurora: Class 2-S**

This Class consists of the Allowed Secured Claim held by Aurora Loan Services LLC ("Aurora"), which is secured by a first position interest in the Blackhawk Property. Aurora filed a Secured Proof of Claim in the amount of $240,000. The Debtors estimated the value of the Blackhawk Property in their Schedules at $275,000. The Debtors anticipate that they will reach a stipulation with Aurora to lift the stay and allow Aurora to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from Aurora's Claim shall be treated in accordance with Class 3-A. If Aurora so chooses, the Debtors will execute for Aurora's benefit a deed in lieu of foreclosure transferring the Blackhawk Property to Aurora.

20. **Homecomings: Class 2-T**

This Class consists of the Allowed Secured Claim held by Homecomings Financial, LLC ("Homecomings"), which is secured by a second position interest in the Blackhawk Property. Homecomings filed a Secured Proof of Claim in the amount of $30,075.85. The Debtors estimated the value of the Blackhawk Property in their Schedules at $275,000. The Debtors anticipate that they will reach a stipulation with Homecomings to lift the stay and allow Homecomings to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from Homecomings' Claim shall be treated in accordance with Class 3-A. If Homecomings so chooses, the Debtors will execute for Homecomings' benefit a deed in lieu of foreclosure transferring the Blackhawk Property to Homecomings.

S:\Weldon.G\2814701\Pleadings\Plan.doc

**21.    Springfield Park:  Class 2-U**

This Class consists of the Allowed Secured Claims held by Springfield Park HOA ("Springfield Park") that is secured by a homeowner's association lien on the Blackhawk Property. The Debtors anticipate that this Allowed Secured Claim will be allowed in the approximate amount of $219.65. The Debtors anticipate that they will reach a stipulation with Springfield Park to lift the stay and allow Springfield Park to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from Springfield Park's Claim shall be treated in accordance with Class 3-A.

**22.    EMC:  Class 2-V**

This Class consists of the Allowed Secured Claim held by The Bank of New York Mellon as servicing agent for EMC Mortgage Corporation ("EMC"), which is secured by a first position interest in the Roy Rogers Property. EMC filed a Secured Proof of Claim in the amount of $302,445.29. The Debtors estimated the value of the Roy Rogers Property in their Schedules at $275,000. The Debtors anticipate that they will reach a stipulation with EMC to lift the stay and allow EMC to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from EMC's Claim shall be treated in accordance with Class 3-A. If EMC so chooses, the Debtor will execute for EMC's benefit a deed in lieu of foreclosure transferring the Roy Rogers Property to EMC.

**23.    EMC:  Class 2-W**

This Class consists of the Allowed Secured Claim held by EMC Mortgage Corporation ("EMC"), which is secured by a second position interest in the Roy Rogers Property. EMC filed a Secured Proof of Claim in the amount of $133,570.26. The Debtors estimated the value of the Roy Rogers Property in their Schedules at $275,000. The Debtors anticipate that they will reach a stipulation with EMC to lift the stay and allow EMC to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any

inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from EMC's Claim shall be treated in accordance with Class 3-A. If EMC so chooses, the Debtors will execute for EMC's benefit a deed in lieu of foreclosure transferring the Roy Rogers Property to EMC.

### 24.  DMR: Class 2-X

This Class consists of the Allowed Secured Claims held by Dynamite Mountain Ranch HOA ("DMR") that is secured by a homeowner's association lien on the Roy Rogers Property. DMR filed a Secured Proof of Claim in the amount of $465. The Debtors anticipate that they will reach a stipulation with DMR to lift the stay and allow DMR to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from DMR's Claim shall be treated in accordance with Class 3-A.

### 25.  CMC: Class 2-Y

This Class consists of the Allowed Secured Claim held by Central Mortgage Company ("CMC"), which is secured by a first position interest in the 28th Drive Property. CMC filed a Secured Proof of Claim in the amount of $139,300. The Debtors estimated the value of the 28th Drive Property in their Schedules at $189,000. The Debtors anticipate that they will reach a stipulation with CMC to lift the stay and allow CMC to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from CMC's Claim shall be treated in accordance with Class 3-A. If CMC so chooses, the Debtors will execute for CMC's benefit a deed in lieu of foreclosure transferring the 28th Drive Property to CMC.

### 26.  GMAC: Class 2-Z

This Class consists of the Allowed Secured Claim held by GMAC Mortgage, LLC ("GMAC"), which is secured by a second position interest in the 28th Drive Property. GMAC filed a Secured Proof of Claim in the amount of $65,298.05. The Debtors estimated the value of the 28th Drive Property in their Schedules at $189,000. The Debtors anticipate that they will reach a

stipulation with GMAC to lift the stay and allow GMAC to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from GMAC's Claim shall be treated in accordance with Class 3-A. If GMAC so chooses, the Debtors will execute for GMAC's benefit a deed in lieu of foreclosure transferring the 28th Drive Property to GMAC.

### 27.    Golden Key:  Class 2-AA

This Class consists of the Allowed Secured Claims held by Golden Key HOA ("Golden Key") that is secured by a homeowner's association lien on the 28th Drive Property. The Debtors anticipate that this Allowed Secured Claim will be allowed in the approximate amount of $563. The Debtors anticipate that they will reach a stipulation with Golden Key to lift the stay and allow Golden Key to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from Golden Key's Claim shall be treated in accordance with Class 3-A.

### 28.    TB&W:  Class 2-BB

This Class consists of the Allowed Secured Claim held by Taylor Bean & Whitaker ("TB&W"), which is secured by a first position interest in the Straight Arrow Property. The Debtors anticipate that this Allowed Secured Claim will be allowed in the approximate amount of $306,000. The Debtors estimated the value of the Straight Arrow Property in their Schedules at $275,000. The Debtors anticipate that they will reach a stipulation with TB&W to lift the stay and allow TB&W to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from TB&W's Claim shall be treated in accordance with Class 3-A. If TB&W so chooses, the Debtors will execute for TB&W's benefit a deed in lieu of foreclosure transferring the Straight Arrow Property to TB&W.

### 29.    TB&W:  Class 2-CC

This Class consists of the Allowed Secured Claim held by Taylor Bean & Whitaker ("TB&W"), which is secured by a second position interest in the Straight Arrow Property. The Debtors anticipate that this Allowed Secured Claim will be allowed in the approximate amount of $56,530.87. The Debtors estimated the value of the Straight Arrow Property in their Schedules at $275,000. The Debtors anticipate that they will reach a stipulation with TB&W to lift the stay and allow TB&W to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from TB&W's Claim shall be treated in accordance with Class 3-A. If TB&W so chooses, the Debtors will execute for TB&W's benefit a deed in lieu of foreclosure transferring the Straight Arrow Property to TB&W.

### 30. DMR: Class 2-DD

This Class consists of the Allowed Secured Claims held by Dynamite Mountain Ranch ("DMR") that is secured by a homeowner's association lien on the Straight Arrow Property. DMR filed a secured proof of claim in the amount of $540.00. The Debtors anticipate that they will reach a stipulation with DMR to lift the stay and allow DMR to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from DMR's Claim shall be treated in accordance with Class 3-A.

### 31. EMC: Class 2-EE

This Class consists of the Allowed Secured Claim held by Citibank, N.A. as servicing agent for EMC Mortgage Corporation ("EMC"), which is secured by a first position interest in the Via Dona Property. EMC filed a Secured Proof of Claim in the amount of $300,285.24. The Debtors estimated the value of the Via Dona Property in their Schedules at $200,000. The Debtors anticipate that they will reach a stipulation with EMC to lift the stay and allow EMC to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting

from EMC's Claim shall be treated in accordance with Class 3-A. If EMC so chooses, the Debtors will execute for EMC's benefit a deed in lieu of foreclosure transferring the Via Dona Property to EMC.

**32.  TB&W:  Class 2-FF**

This Class consists of the Allowed Secured Claim held by Taylor Bean & Whitaker ("TB&W"), which is secured by a second position interest in the Via Dona Property. The Debtors anticipate that this Allowed Secured Claim will be allowed in the approximate amount of $74,595.00. The Debtors estimated the value of the Via Dona Property in their Schedules at $200,000. The Debtors anticipate that they will reach a stipulation with TB&W to lift the stay and allow TB&W to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from TB&W's Claim shall be treated in accordance with Class 3-A. If TB&W so chooses, the Debtors will execute for TB&W's benefit a deed in lieu of foreclosure transferring the Via Dona Property to TB&W.

**33.  DMR:  Class 2-GG**

This Class consists of the Allowed Secured Claims held by Dynamite Mountain Ranch ("DMR") that is secured by a homeowner's association lien on the Via Dona Property. DMR filed a secured proof of claim in the amount of $465.00. The Debtors anticipate that they will reach a stipulation with DMR to lift the stay and allow DMR to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from DMR's Claim shall be treated in accordance with Class 3-A.

**34.  ASC:  Class 2-HH**

This Class consists of the Allowed Secured Claim held by America's Servicing Company ("ASC"), which is secured by a first position interest in the Big Oak Property. ASC filed a Secured Proof of Claim in the amount of $248,320.50. The Debtors estimated the value of the Big Oak Property in their Schedules at $175,000. The Debtors anticipate that they will reach

a stipulation with ASC to lift the stay and allow ASC to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from ASC's Claim shall be treated in accordance with Class 3-A. If ASC so chooses, the Debtors will execute for ASC's benefit a deed in lieu of foreclosure transferring the Big Oak Property to ASC.

### 35.     Ocwen: Class 2-II

This Class consists of the Allowed Secured Claim held by Ocwen, which is secured by a second position interest in the Big Oak Property. The Debtors anticipate that this Allowed Secured Claim will be allowed in the approximate amount of $109,667.41. The Debtors estimated the value of the Big Oak Property in their Schedules at $175,000. The Debtors anticipate that they will reach a stipulation with Ocwen to lift the stay and allow Ocwen to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from Ocwen's Claim shall be treated in accordance with Class 3-A. If Ocwen so chooses, the Debtors will execute for Ocwen's benefit a deed in lieu of foreclosure transferring the Big Oak Property to Ocwen.

### 36.     DMR: Class 2-JJ

This Class consists of the Allowed Secured Claims held by Dynamite Mountain Ranch ("DMR") that is secured by a homeowner's association lien on the Big Oak Property. DMR filed a secured proof of claim in the amount of $565.00. The Debtors anticipate that they will reach a stipulation with DMR to lift the stay and allow DMR to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from DMR's Claim shall be treated in accordance with Class 3-A.

### 37.     EMC: Class 2-KK

This Class consists of the Allowed Secured Claim held by EMC Mortgage Corporation ("EMC"), which is secured by a first position interest in the Running Deer Property.

EMC filed a Secured Proof of Claim in the amount of $262,973.73. The Debtors estimated the value of the Running Deer Property in their Schedules at $175,000. The Debtors anticipate that they will reach a stipulation with EMC to lift the stay and allow EMC to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from EMC's Claim shall be treated in accordance with Class 3-A. If EMC so chooses, the Debtors will execute for EMC's benefit a deed in lieu of foreclosure transferring the Running Deer Property to EMC.

### 38. EMC: Class 2-LL

This Class consists of the Allowed Secured Claim held by EMC Mortgage Corporation ("EMC"), which is secured by a second position interest in the Running Deer Property. The Debtors anticipate that this Allowed Secured Claim will be allowed in the approximate amount of $83,000. The Debtors estimated the value of the Running Deer Property in their Schedules at $175,000. The Debtors anticipate that they will reach a stipulation with EMC to lift the stay and allow EMC to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from EMC's Claim shall be treated in accordance with Class 3-A. If EMC so chooses, the Debtors will execute for EMC's benefit a deed in lieu of foreclosure transferring the Running Deer Property to EMC.

### 39. DMR: Class 2-MM

This Class consists of the Allowed Secured Claims held by Dynamite Mountain Ranch ("DMR") that is secured by a homeowner's association lien on the Running Deer Property. DMR filed a secured proof of claim in the amount of $1,040. The Debtors anticipate that they will reach a stipulation with DMR to lift the stay and allow DMR to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from DMR's Claim shall be treated in accordance with Class 3-A.

### 40. M&I: Class 2-NN

This Class consists of the Allowed Secured Claim held by M&I Marshall & Ilsley Bank ("M&I"), which is secured by a first position interest in the 70th Street Property. M&I filed a secured proof of claim in the amount of $130,628.32. The Debtors estimated the value of the 70th Street Property in their Schedules at $230,000, although given the current real estate market, the Debtors believe the value to essentially be the amount that is owing on this property. The Debtors entered into a Stipulation providing for: (1) relief from the automatic stay; and (2) other related relief with M&I which was filed with the Court on February 25, 2009, copy of which is attached hereto as Exhibit "A". Pursuant to this Stipulation, the Debtors have a period of time to market this property or bring the payments current so that they can keep this property. This Stipulation is specifically incorporated herein by reference.

### 41. M&I: Class 2-OO

This Class consists of the Allowed Secured Claim held by M&I Marshall & Ilsley Bank ("M&I"), which is secured by a first position interest in the Celestial Property. M&I filed a secured proof of claim in the amount of $200,675.40. The Debtors estimated the value of the Celestial Property in their Schedules at $289,000, although given the current real estate market, the Debtors believe the value to essentially be the amount that is owing on this property. The Debtors entered into a Stipulation providing for: (1) relief from the automatic stay, and (2) other related relief with M&I which was filed with the Court on February 25, 2009, a copy of which is attached hereto as Exhibit "B". Pursuant to this Stipulation, the Debtors have a period of time to market this property or bring the payments current so that they can keep this property. This Stipulation is specifically incorporated herein by reference.

### 42. DMMA: Class 2-PP

This Class consists of the Allowed Secured Claim held by Desert Mountain Master Association ("DMMA") that is secured by a homeowner's association lien on the Celestial Property. The Debtors anticipate that this Allowed Secured Claim will be allowed in the approximate amount of $919.20. The Debtors estimated the value of the Celestial Property in their Schedules at $289,000. If this property goes back to the lender, the lender will be responsible for payment the homeowners association dues. If the Debtors are able to retain this property, the

Debtors will be responsible for paying the homeowners association dues by paying equal monthly payments over one year from the Effective Date.

### 43.    First Credit Union: Class 2-QQ

This Class consists of the Allowed Secured Claim held by First Credit Union, which is secured by a first position interest in the Rio Verde Property. First Credit Union filed a secured proof of claim in the amount of $95,016.20. The Debtors estimated the value of the Rio Verde Property in their Schedules at $169,000, although given the current real estate market, the Debtors believe the value to essentially be the amount that is owing on this property. The Debtors entered into a Stipulation providing for: (1) relief from the automatic stay, and (2) other related relief with M&I which was filed with the Court on February 23, 2009, a copy of which is attached hereto as Exhibit "C". Pursuant to this Stipulation, the Debtors have a period of time to market this property or bring the payments current so that they can keep this property. This Stipulation is specifically incorporated herein by reference.

### 44.    National City Mortgage: Class 2-RR

This Class consists of the Allowed Secured Claim held by National City Mortgage, which is secured by a first position interest in the 63rd Street Property. National City Mortgage filed a Secured Proof of Claim in the amount of $619,600. The Debtors estimated the value of the 63rd Street Property in their Schedules at $800,000. The Debtors anticipate that they will reach a stipulation with National City Mortgage to lift the stay and allow National City Mortgage to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from National City Mortgage's Claim shall be treated in accordance with Class 3-A. If National City Mortgage so chooses, the Debtors will execute for National City Mortgage's benefit a deed in lieu of foreclosure transferring the 63rd Street Property to National City Mortgage.

### 45.    Countrywide: Class 2-SS

This Class consists of the Allowed Secured Claim held by Countrywide, which is secured by a second position interest in the 63rd Street Property. The Debtors anticipate that this Allowed Secured Claim will be allowed in the approximate amount of $155,000. The

Debtors estimated the value of the 63rd Street Property in their Schedules at $800,000. The Debtors anticipate that they will reach a stipulation with Countrywide to lift the stay and allow Countrywide to foreclose upon the property. In the event such a stipulation is reached, it is specifically incorporated herein, and to the extent of any inconsistency between the terms of the stipulation and the terms of the Plan, the terms of the stipulation control. Any deficiency resulting from Countrywide's Claim shall be treated in accordance with Class 3-A. If Countrywide so chooses, the Debtors will execute for Countrywide's benefit a deed in lieu of foreclosure transferring the 63rd Street Property to Countrywide.

### 46. Honda: Class 2-TT

This Class consists of the Allowed Secured Claims held by American Honda Finance ("Honda"), which is secured by a first position interest in the Debtors' 2004 Honda Pilot. Honda has filed a secured Proof of Claim in amount of $1,545.83 for past amounts due. The total amount owed to Honda is $9,700.77. The Debtors will surrender this vehicle to Honda. The balance of any Allowed Claim Honda may hold shall be treated in accordance with the terms of Class 3-A.

### 47. USAA: Class 2-UU

This Class consists of the Allowed Secured Claims held by USAA Federal Savings Bank ("USAA"), which is secured by a first position interest in the Debtors' 2002 BMW. USAA has filed a secured Proof of Claim in the amount of $31,051.73. The Debtors will surrender this vehicle to USAA. The balance of any Allowed Claim USAA may hold shall be treated in accordance with the terms of Class 3-A.

### C. Unsecured Claims: Class 3

### 1. General Unsecured Claims: Class 3-A

Class 3-A consists of the Allowed Unsecured Claims of Creditors. Class 3-A Creditors shall be paid a pro-rata share from the Debtors' Excess Cash Flow, on a quarterly basis, in an amount sufficient to fund the value of the Debtors' Liquidation Equity as calculated in the Debtors' Disclosure Statement, after all senior Allowed Claims have been paid in full. Any Allowed Unsecured Claims that are determined to be non-dischargeable will continue to receive a

pro-rata distribution of the Excess Cash Flow after all senior Allowed Claims have been paid, until satisfied in full.

### D. Debtors' Interest: Class 4

#### 1. Debtors' Interest: Class 4-A

Pursuant to §1129(a)(15) and (b)(2)(B)(ii) of the Bankruptcy Code, the Debtors shall retain their interest in all estate property in consideration of their funding of Allowed Claims and shall receive all exempt property.

## V. MEANS FOR EXECUTING THE PLAN

### A. Funding

Pursuant to §1123(a)(8) of the Bankruptcy Code, the Debtors shall provide for the payment to creditors under the Plan of all or such portion of earnings from personal services performed by the Debtors after the commencement of the case or other future income of the Debtors as is necessary for the execution of the Plan. The Debtors will contribute their Excess Cash Flow in an amount sufficient to fund the value of their Liquidation Equity.

### B. Liquidation of Estate Property.

The Debtors shall have the authority to retain such brokers, agents, counsel, or representatives, as they deem necessary to liquidate all assets of the bankruptcy estate. Prior to Confirmation, the Debtors shall sell their Real Property pursuant to an order of the Bankruptcy Court to the highest and best bidder. Any sales which occur post-confirmation shall not require approval of the Bankruptcy Court for the sale, although the Debtors will be free to seek such order if it deems appropriate.

### C. Management

The Reorganized Debtors will continue to operate under the same management structure utilized prior to Confirmation.

### D. Disbursing Agent.

The Reorganized Debtors shall act as the Disbursing Agent under the Plan.

### E. Documentation of Plan Implementation.

In the event any entity which possesses an Allowed Secured Claim or any other lien in any of the Debtors' property for which the Plan requires the execution of any documents to incorporate the terms of the Plan, fails to provide a release of its lien or execute the necessary documents to satisfy the requirements of the Plan, the Debtors may record a copy of this Plan or the Confirmation Order with the appropriate governmental agency and such recordation shall constitute the lien release and creation of any necessary new liens to satisfy the terms of the Plan. If the Debtors deem advisable, they may obtain a further Order from the Court that may be recorded in order to implement the terms of the Plan.

## VI. EFFECT OF CONFIRMATION

Except as otherwise provided in the Plan or the Confirmation Order, Confirmation acts as a discharge, effective as of Confirmation, of any and all debts of the Debtors, that arose any time before the entry of the Confirmation Order including, but not limited to, all principal and all interest accrued thereon, pursuant to § 1141(d)(1) of the Bankruptcy Code. The discharge shall be effective as to each Claim, regardless of whether a proof of claim thereon was filed, whether the Claim is an Allowed Claim, or whether the holder thereof votes to accept the Plan.

In addition, any pre-confirmation obligations of the Debtors dealt with in this Plan shall be considered New Obligations of the Debtors, and these New Obligations shall not be considered in default unless and until the Reorganized Debtors default on the New Obligations pursuant to the terms of the Plan. The New Obligations provided for in the Plan shall be in the place of, and completely substitute for, any pre-Confirmation obligations of the Debtors and, once the Plan is confirmed, the only obligations of the Debtors shall be such New Obligations as provided for under the Plan.

## VII. OBJECTIONS TO AND ESTIMATIONS OF CLAIMS

### A. Objections and Bar Date for Filing Objections.

As soon as practicable, but in no event later than 120 days after the Effective Date, objections to Claims shall be filed with the Bankruptcy Court and served upon the Debtors and the holders of each of the Claims to which objections are made pursuant to the Bankruptcy Code and the Bankruptcy Rules. Objections filed after such date will be barred.

**B.  Settlement of Claims.**

Settlement of any objection to a Claim not exceeding $10,000 shall be permitted on the eleventh (11th) day after notice of the settlement has been provided to the Debtors, the Creditors, the settling party, and other persons specifically requesting such notice, and if on such date there is no written objection filed, such settlement shall be deemed approved.  In the event of a written objection to the settlement, the settlement must be approved by the Court on notice to the objecting party.

**C.  Estimation of Claims.**

For purposes of making distributions provided for under the Plan, all Claims objected to shall be estimated by the Disbursing Agent at an amount equal to (i) the amount, if any, determined by the Court pursuant to §502(c) of the Bankruptcy Code as an estimate for distribution purposes; (ii) an amount agreed to between the Debtor and the Claimant; or, (iii) that amount set forth as an estimate in the Plan or Disclosure Statement.  Notwithstanding anything herein to the contrary, no distributions shall be made on account of any Claim until such Claim is an Allowed Claim.

**D.  Unclaimed Funds and Interest.**

Distribution to Claimants shall be mailed by the Reorganized Debtors to the Claimants at the address appearing on the master mailing matrix unless the Claimant provides the Reorganized Debtors with an alternative address.  For a period of one year from the date that a distribution was to be made by the disbursing agent but has gone uncollected by the Claimant, the disbursing agent shall retain any distributions otherwise distributable hereunder which remain unclaimed or as to which the disbursing agent has not received documents required pursuant to the Plan. Thereafter, the unclaimed funds shall revest in the Reorganized Debtors.

**VIII.  NONALLOWANCE OF PENALTIES AND FINES**

No distribution shall be made under this Plan on account of, and no other Allowed Claim, whether secured, unsecured, administrative, or priority, shall include any fine, penalty, exemplary or punitive damages, late charges, default interest or other monetary charges relating to or arising

from any default or breach by the Debtors, and any Claim on account thereof shall be deemed disallowed, whether or not an objection was filed to it.

## IX.   CLOSING OF CASE

Until this case is officially closed, the Reorganized Debtors will be responsible for filing pre- and post-confirmation reports required by the United States Trustee and paying the quarterly post-confirmation fees of the United States Trustee, in cash, pursuant to 28 U.S.C. §1930, as amended. Pursuant to 11 U.S.C. §1129(a)(12), all fees payable under section 1930 of title 28, as determined by the Court at the hearing on confirmation of the Plan, will be paid, in cash, on the Effective Date.

## X.   MODIFICATION OF THE PLAN

In addition to their modification rights under §1127 of the Bankruptcy Code, the Debtors may amend or modify this Plan at any time prior to Confirmation without leave of the Court. The Debtors may propose amendments and/or modifications of this Plan at any time subsequent to Confirmation with leave of the Court and upon notice to Creditors. After Confirmation of the Plan, the Debtors may, with approval of the Court, as long as it does not materially or adversely affect the interests of Creditors, remedy any defect or omission or reconcile any inconsistencies of the Plan, or in the Confirmation Order, if any may be necessary to carry out the purposes and intent of this Plan.

## XI.   JURISDICTION OF THE COURT

The Court will retain jurisdiction until this Plan has been fully consummated for including, but not limited to, the following purposes:

1. The classification of the Claims of any Creditors and the re-examination of any Claims which have been allowed for the purposes of voting, and for the determination of such objections as may be filed to the Creditor's Claims. The failure by the Debtors to object to or examine any Claim for the purpose of voting shall not be deemed to be a waiver of the Debtors' rights to object to or to re-examine the Claim in whole or in part.

2. To determine any Claims which are disputed by the Debtors, whether such objections are filed before or after Confirmation, to estimate any Unliquidated or Contingent Claims pursuant

to 11 U.S.C. § 502(c)(1) upon request of the Debtor or any holder of a Contingent or Unliquidated Claim, and to make determination on any objection to such Claim.

3. To determine all questions and disputes regarding title to the assets of the estate, and determination of all causes of action, controversies, disputes or conflicts, whether or not subject to action pending as of the date of Confirmation, between the Debtors and any other party, including but not limited to, any rights of the Debtors to recover assets pursuant to the provisions of the Bankruptcy Code.

4. The correction of any defect, the curing of any omission or any reconciliation of any inconsistencies in this Plan, or the Confirmation Order, as may be necessary to carry out the purposes and intent of this Plan.

5. The modification of this Plan after Confirmation, pursuant to the Bankruptcy Rules and the Bankruptcy Code.

6. To enforce and interpret the terms and conditions of this Plan.

7. The entry of an order, including injunctions, necessary to enforce the title, rights and powers of the Debtors, and to impose such limitations, restrictions, terms and conditions of such title, right and power that this Court may deem necessary.

8. The entry of an order concluding and terminating this case.

## XII. RETENTION AND ENFORCEMENT OF CLAIMS

Pursuant to §1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce any and all claims of the Debtors, except those claims specifically waived herein.

## XIII. EXECUTORY CONTRACTS

The Debtors reject all executory contracts and unexpired leases not otherwise assumed herein or by separate order of the Court. Claims for any executory contracts or unexpired leases rejected by the Debtors shall be filed no later than ten (10) days after the earlier of Confirmation or the date the executory contract or unexpired lease is specifically rejected. Any such Claims not timely filed and served shall be disallowed.

## XIV. REVESTING

1

2        Except as provided for in the Plan or in the Confirmation Order, on the Effective Date the

3  Reorganized Debtors shall be vested with all the property of the estate free and clear of all claims,

4  liens, charges, and other interests of Creditors, arising prior to the Effective Date.   Upon the

5  Effective Date, the Reorganized Debtors shall operate their business free of any restrictions.

6

7      DATED this 7th day of ~~March,~~ April 2009.

8

9                 AIKEN SCHENK HAWKINS & RICCIARDI P.C.

10

11                 By_____
                     D. Lamar Hawkins

12                     4742 North 24th St., Suite 100
                     Phoenix, Arizona 85016

13                     Attorney for Debtors

14               _____
               Gregory Louis Weldon, Debtor-in-Possession

15

16               _____
               Nicole Ann Weldon, Debtor-in-Possession

17

18

19  COPY of the foregoing mailed

20  or served via (fax* or electronic
    notification** if so marked)

21  this ___ day of April, 2009, to:

22  Office of the U.S. Trustee
    230 North First Ave., Suite 204

23  Phoenix, AZ  85003-1706

24  Josephine E. Salmon jsalmon@piteduncan.com
    PITE DUNCAN, LLP

25  4375 Jutland Drive, Suite 200
    San Diego, CA 92117

26  Attorney for: Homecomings Financial, LLC, GMAC Mortgage, LLC

27  Christopher Perry aznotices@logs.com
    PERRY & SHAPIRO, LLP

28  3300 N. Central Ave., Suite 2200
    Phoenix, AZ 85012

C:\Documents and Settings\Greg\Local Settings\Temporary Internet Files\Content.Outlook\155L7K9X\Plan.doc

37

Attorney for: Chase Home Finance LLC

Maria Tsagaris
MCCALLA RAYMER, LLC
1544 Old Alabama Road
Roswell, GA 30076-0279
Attorney for: America's Servicing Company

Christina M. Harper Christina.harper@azag.gov
1275 W. Washington Street
Phoenix, AZ 85007-8365
Attorney for: Arizona Department of Revenue

Kristen L. Rosenbeck bmulcahy@mulcahylaw.net
MULCAHY LAW FIRM, P.C.
3001 E. Camelback Road, Suite 130
Phoenix, AZ 85016
Attorney for: The Mews on Twenty-Eighth Street, Inc.

Mark S. Bosco msb@tblaw.com
TIFFANY & BOSCO P.A.
2525 E. Camelback Road
Suite 300
Phoenix, AZ 85016
Attorney for: Central Mortgages Company, Accubanc Mortgages, and City Mortgage/Fidelity

Larry O. Folks, Esq. #012142
**FOLKS & O'CONNOR, PLLC**
1850 N. Central Ave, Suite 1140
Phoenix, Arizona 85004
Telephone: (602) 256-5906
Facsimile: (602) 256-9101
E-mail: *folks@folksoconnor.com*
*Attorneys for M&I Marshall & Ilsley Bank*

D. Lamar Hawkins, Esq. # 013251
**AIKEN SCHENK HAWKINS & RICCIARDI, P.C.**
4742 North 24th Street, Suite 100
Phoenix, Arizona 85016
Telephone: (602) 248-8203
Facsimile: (602) 248-8840
E-mail: *dlh@hs-law.com*
*Attorneys for the Debtors*

**IN THE UNITED STATES BANKRUPTCY COURT**

**IN AND FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| In re:<br><br>GREGORY LOUIS WELDON AND<br>NICOLE ANN WELDON,<br><br>        Debtors. | Chapter 11 Proceeding<br><br>Case No.: 2:08-bk-12336-SSC |
| M&I MARSHALL & ILSLEY BANK, a<br>Wisconsin corporation,<br><br>        Movant,<br><br>v.<br><br>GREGORY LOUIS WELDON AND<br>NICOLE ANN WELDON,<br><br>        Respondents. | **STIPULATION PROVIDING FOR:<br>(1) RELIEF FROM THE<br>AUTOMATIC STAY; AND (2)<br>OTHER RELATED RELIEF**<br><br>**(Concerns real property located<br>at 298xx North 70th Street,<br>Scottsdale, Arizona 85331)** |

M&I Marshall & Ilsley Bank, a Wisconsin corporation ("M&I Bank"), a secured creditor in the above-captioned bankruptcy proceeding, and Gregory Louis Weldon and Nicole Ann Weldon, the debtors and debtors-in-possession (the "Debtors"), hereby

FOLKS & O'CONNOR, PLLC
1850 NORTH CENTRAL AVE, SUITE 1140
PHOENIX, ARIZONA 85004
(602) 262-2265

FOLKS & O'CONNOR, PLLC
1850 NORTH CENTRAL AVE, SUITE 1140
PHOENIX, ARIZONA 85004
(602) 262-2265

submit this written stipulation (this "Stipulation") and represent the following to the Bankruptcy Court:

## I.

## RECITALS

1.     On September 16, 2008 (the "Petition Date"), the Debtors filed a voluntary petition relief under Chapter 11 of the Bankruptcy Code.

2.     On or about October 12, 2004, Gregory Weldon executed and delivered to M&I Bank a certain Mortgage Note in the original principal balance of $129,375.00, which has been replaced and renewed by a certain Mortgage Note dated October 23, 2007 (collectively, the "Note"). A true and accurate copy of the Note is attached hereto as Exhibit 1 and is herein incorporated by this reference.

3.     On October 12, 2004, Gregory Weldon, as trustor, executed and delivered to M&I Bank, as beneficiary, a certain Deed of Trust which was recorded on October 13, 2004, with the Maricopa County Recorder as Instrument No. 2004-1197602 (the "Deed of Trust") to pledge a security interest in and lien upon an undeveloped lot located at 298xx North 70th Street, Scottsdale, Arizona 85331, known as Tax Parcel No. 216-67-116B 8 and legally described by the Deed of Trust (the "Property"). A true and accurate copy of the Deed of Trust is attached hereto as Exhibit 2 and is herein incorporated by this reference.

4.     M&I Bank is the sole holder and owner of the Note and Deed of Trust.

5.     The Note and Deed of Trust, taken collectively, evidence M&I Bank's valid, perfected and first-priority lien upon the Property.

6.     As of the Debtors' Petition Date, they had failed to remit one monthly installment payment of $808.59 and a $40.43 late fee for a total of $849.02.

7.     As of the Debtors' Petition Date, the balance due under the Note was

comprised of the following: (i) $129,375.00 of unpaid principal; (ii) $1,212.89 of accrued and unpaid interest; and (iii) $40.43 of late fees for a total of $130,628.32 (the "Loan Balance").

8.    The Debtors have not paid any post-petition payments to M&I Bank.

## II.

## OPERATIVE PROVISIONS

WHEREFORE, based upon the foregoing, M&I Bank and the Debtors hereby **STIPULATE AND AGREE** as follows:

A.    That the Recitals set forth above are true and correct and are hereby incorporated into this Operative Provisions section of this Stipulation by reference;

B.    That this Stipulation is subject to Bankruptcy Court approval pursuant to Bankruptcy Rule 4001(d) and Local Bankruptcy Rule 4001-1(c)(2) and, as a result, shall be filed with the Court and noticed to all required creditors and parties-in-interest by a negative notice describing the terms of the Stipulation and establishing an objection deadline. In the event that no timely objection to approval of the terms of the Stipulation is filed by a creditor, or party-in-interest, counsel for M&I Bank shall file a Certificate of Service and No Objection and upload a form of order through the Bankruptcy Court electronic filing system approving the terms of the Stipulation for signature by Judge Curley;

C.    The Debtors hereby acknowledge that M&I Bank holds a valid, perfected and enforceable first-priority lien upon the Property and shall retain such lien upon the Property;

D.    The Debtors acknowledge that neither M&I Bank's lien upon the Property, nor any transfer made to M&I Bank, is subject to avoidance under Bankruptcy Code §§544, 545, 546, 547, 548, 549, 550, nor any other provision of the Bankruptcy

FOLKS & O'CONNOR, PLLC
1850 NORTH CENTRAL AVE, SUITE 1140
PHOENIX, ARIZONA 85004
(602) 262-2265

Code;

E.    That M&I Bank's secured claim evidenced by the Note and Deed of Trust is an allowed secured claim as defined by Bankruptcy Code §§502(a) and 506(a);

F.    That Debtors shall maintain insurance coverage on the Property in an amount which is at least equal to the amount of insurance coverage required under the Note and Deed of Trust;

G.    Debtors shall have from the date of approval of this Stipulation by the Bankruptcy Court until Monday, July 20, 2009, at 5:00 p.m. Mountain Standard Time (the "Marketing Period") to market and sell the Property.

H.    Any sale of the Property must be for cash only and at a price and with terms subject to prior approval of, and acceptable to, M&I Bank and subject to M&I Bank's right to submit a "credit bid" at the sale as authorized by Bankruptcy Code §363(k). In the event that a bona fide purchaser of the Property is located prior to expiration of the Marketing Period, Debtors shall enter into a purchase contract for the sale of the Property, open a sale escrow with a title company and file a Motion To Sell the Property "free and clear of all liens" with the Bankruptcy Court pursuant to Bankruptcy Code §363(f) which shall provide that M&I Bank's first-priority lien will attach to the Property sale proceeds;

I.    In the event that the Debtors have entered into a purchase contract with a bona fide purchaser of the Property, opened a sale escrow with a title company and filed a Motion To Sell the Property (as described above) with the Bankruptcy Court on or prior to expiration of the Marketing Period, Debtors shall have thirty (30) additional calendar days, until Wednesday, August 19, 2009, at 5:00 p.m. Mountain Standard Time (the "Extended Marketing Period"), to obtain Bankruptcy Court approval of the sale and close the sale of the Property;

FOLKS & O'CONNOR, PLLC
1850 NORTH CENTRAL AVE., SUITE 1140
PHOENIX, ARIZONA 85004
(602) 262-2265

4

FOLKS & O'CONNOR, PLLC
1850 NORTH CENTRAL AVE., SUITE 1140
PHOENIX, ARIZONA 85004
(602) 262-2265

K.      Subject to its right to object upon reasonableness grounds, M&I Bank consents to the payment of reasonable costs and expenses associated with the marketing and sale of the Property including a brokerage commission not to exceed five percent (5%) of the gross sales price of the Property;

L.      Debtors and M&I Bank hereby agree that upon entry of a Bankruptcy Court order approving the terms set forth in this Stipulation, M&I Bank shall have immediate relief from the bankruptcy automatic stay imposed by Bankruptcy Code Section 362(a), and any other applicable stays and injunctions, with respect to its lien interest in the Property to allow it to commence a non-judicial trustee's sale of the Property pursuant to applicable Arizona foreclosure law located at A.R.S. §33-801 *et. seq.* (the "Foreclosure Sale"). M&I Bank, however, covenants and agrees that it <u>shall not</u> conduct the pending Foreclosure Sale of the Property: (a) until expiration of the Marketing Period on July 20, 2009, or, if applicable, expiration of the Extended Marketing Period on August 19, 2009; or alternatively, (b) if Debtors shall have reinstated the Note by paying current all unpaid post-petition monthly payments (due on the 1st calendar day of each month) of $808.59 then due and timely remitting all subsequent monthly payments in said amount due under the Note (the "Monthly Note Payments"); provided, however, that M&I Bank may send a ten (10) calendar day Notice of Default with respect to any untimely Monthly Note Payment by the Debtors and complete the Foreclosure Sale, without the need for an order or additional relief from the Bankruptcy Court, in the event that the Debtors fail to cure any untimely Monthly Note Payment during the 10-day cure period provided for by the Notice of Default.

M.      Debtors and M&I Bank agree that the terms of this Stipulation shall be expressly ratified by and included in any Chapter 11 plan of reorganization to be filed

FOLKS & O'CONNOR, PLLC
1850 NORTH CENTRAL AVE, SUITE 1140
PHOENIX, ARIZONA 85004
(602) 262-2265

by the Debtors in this bankruptcy proceeding;

N. Nothing contained herein shall prejudice, impair or otherwise affect the right of M&I Bank, at any time, to seek: (i) dismissal or conversion of this case under Bankruptcy Code §1112; (ii) appointment of a Chapter 11 Trustee; or (iii) any other appropriate relief available under the Bankruptcy Code;

O. Except as otherwise provided for herein, nothing in this Stipulation is intended to, nor shall, affect M&I Bank's nor the Debtors' (or their respective success-in-interest') rights, remedies or obligations under Note and Deed of Trust or applicable non-bankruptcy law;

P. Except as specifically provided for herein, the provisions of this Stipulation shall be without prejudice to, and shall in no way affect, modify, waive or estop the rights, remedies or contentions of M&I Bank or the Debtors with respect to any matter which may rightfully be brought before the Bankruptcy Court;

Q. This Stipulation is signed in connection with a "core" proceeding as defined in 28 U.S.C. §157(b) and shall be valid and effective when approved by the Bankruptcy Court;

R. The provisions of this Stipulation shall be binding upon and inure to the benefit of M&I Bank and the Debtors and their respective successors and assigns including, without limitation, any Chapter 11 or Chapter 7 trustee that may be appointed in this bankruptcy proceeding;

S. Subject to the approval of the Bankruptcy Court, each of the parties hereto represents and warrants that they have full power and authority to enter into this Stipulation;

T. This Stipulation may not be modified, amended, altered or waived except in a writing signed by the parties hereto or their duly authorized agents;

6

U.     This Stipulation may be executed in any number of counterparts, each of which shall be deemed an original, but all of which counterparts taken together shall constitute one and the same instrument; and

[INTENTIONALLY LEFT BLANK]

FOLKS & O'CONNOR, PLLC
1850 NORTH CENTRAL AVE, SUITE 1140
PHOENIX, ARIZONA 85004
(602) 262-2265

7

V.    The Bankruptcy Court shall retain jurisdiction to resolve all disputes concerning the interpretation and enforcement of this Stipulation.

RESPECTFULLY SUBMITTED this 25th day of February, 2009.

**FOLKS & O'CONNOR, PLLC**


By /s/   Larry Folks
Larry O. Folks
1850 North Central Ave, Suite 1140
Phoenix, AZ 85004
*Attorneys for M&I Marshall & Ilsley Bank,, a*
*Wisconsin corporation*

**AIKEN SCHENK HAWKINS & RICCIARDI, P.C.**


By /s/   D. Lamar Hawkins
D. Lamar Hawkins
4742 North 24th Street, Suite 100
Phoenix, AZ 85016
*Attorneys for the Debtors*

**ORIGINAL** of the foregoing
electronically filed this 25th day
of February, 2009,  with:

United States Bankruptcy Court
230 North Central Avenue, Suite 101
Phoenix, AZ 85003-1706

**COPY** of the foregoing mailed
this 25th day of February, 2009, to:

Gregory Louis Weldon
Nicole Ann Weldon
P.O. Box 12696
Scottsdale, AZ 85267
*Debtors*

FOLKS & O'CONNOR, PLLC
1850 NORTH CENTRAL AVE. SUITE 1140
PHOENIX, ARIZONA 85004
(602) 262-2265

D. Lamar Hawkins, Esq.
Aiken Schenk Hawkins & Ricciardi, P.C.
4742 North 24th Street, Suite 100
Phoenix, AZ 85016
*Attorneys for the Debtors*

List Of Twenty Largest Unsecured Creditors

Office of the United States Trustee
230 North First Avenue, Suite 204
Phoenix, AZ 85003

By:___/s/ Kathlyn Maez_____
        An Employee of Folks & O'Connor, PLLC

FOLKS & O'CONNOR, PLLC
1850 NORTH CENTRAL AVE, SUITE 1140
PHOENIX, ARIZONA 85004
(602) 262-2265

9

SECURITY TITLE AGENCY

Return To:
M&I Mortgage Corp.
ATTN: Final Documentation Dept.
P.O. Box 478
Milwaukee, WI 53201-0478

Prepared By:
Peggy A. Metevia, Vice President
M&I Mortgage Corp.

OFFICIAL RECORDS OF MARICOPA
COUNTY RECORDER HELEN PURCELL
20041197602 10/13/2004 15:34
ELECTRONIC RECORDING
Deed of Trust 480430617-15-4-4--

3003
48-30617

————————[Space Above This Line For Recording Data]————————

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated October     12  2004    , together with all Riders to this document.

(B) "Borrower" is

**Greg Weldon husband of Nicole Weldon, as his sole and seperate property**

Borrower is the trustor under this Security Instrument. Borrower's mailing address is
35734 N 30th Dr,          Phoenix, AZ 85086

(C) "Lender" is M&I Marshall and Ilsley Bank

Lender is a   Corporation
organized and existing under the laws of the State of Wisconsin

3003.FRM (09/02)                   **9389453-**                         **WELDON, G**
ARIZONA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT             Form 3003 1/01 (rev. 6/02)

-6(AZ) (0208)
Page 1 of 18

VMP MORTGAGE FORMS - (800)521-7291

Lender's mailing address is    **770 North Water Street**
   **Milwaukee, WI 53202**
Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is

       **Security Title**                         . Trustee's mailing address is

(E) "Note" means the promissory note signed by Borrower and dated   October     12   2004
The Note states that Borrower owes Lender
**One Hundred Twenty Nine Thousand Three Hundred Seventy Five and no/100**         Dollars
(U.S. $   **129,375.00**      ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than   November    1   2007   .
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to

3003A.FRM (09/02)

Initials: _____

-6(AZ) (0208)                 Page 2 of 16                 Form 3003   1/01 (rev. 6/02)

time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of Maricopa :

[Type of Recording Jurisdiction]     [Name of Recording Jurisdiction]

The East half of the Northwest quarter of the Southwest quarter of the Southeast quarter of Section 22 Township 5 North Range 4 East of Gila and Salt River Base and Meridian, Maricopa County, Arizona, EXCEPT all oil, gas and other mineral deposits as reserved in the Patent of said land.

*see attached legal

Parcel ID Number: 216-67-116B 8
298xx N 70th Street
Scottsdale
("Property Address"):

MAIL- Scottsdale AZ 85331
which currently has the address of
                                    [Street]
[City], Arizona 85331
                          [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items

3003B.FRM (08/02)                    9389453-

-6(AZ) (0208)          Page 3 of 16          WELDON, G

Initials

FORM 3003 1/01 (rev. 6/02)

**E X H I B I T  "A"**

THE EAST HALF OF THE NORTHWEST QUARTER OF THE SOUTHWEST QUARTER OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 22, TOWNSHIP 5 NORTH, RANGE 4 EAST OF THE GILA AND SALT RIVER BASE AND MERIDIAN, MARICOPA COUNTY, ARIZONA;

EXCEPT ALL OIL, GAS AND OTHER MINERAL DEPOSITS AS RESERVED IN THE PATENT OF SAID LAND.

pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

3003C.FRM (08/02)

Initials:

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

Case 2:08-bk-12336-SSC    Doc 167-2    Filed 02/25/09    Entered 02/25/09 09:14:14
Desc Exhibit 2    Page 9 of 17

Case 2:08-bk-12336-PS    Doc 561-2    Filed 08/10/12    Entered 08/13/12 06:58:18    Desc
- Chapter 11 Plan    Page 55 of 63

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

3003G.FRM (08/02)

-6(AZ) (0208)                    Page 8 of 15                    Form 3003  1/01 (rev. 6/02)

Initials:

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

30031.FRM (08/02)

-8(AZ) (0208)

Page 10 of 15

Initials:

Form 3003 1/01 (rev. 6/02)

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

3003J.PRM (08/02)

-6(AZ) (0206)   Page 11 of 16

9389453-

Init._____   WELDON, G

Form 3003  1/01 (rev. 6/02)

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

3003K.FRM (08/02)

-6(AZ) (0208)                                    Page 12 of 15                          Initials: [signature]   Form 3003 1/01 (rev. 6/02)

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall record a notice of sale in each county in which any part of the Property is located and shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. After the time required by Applicable Law and after publication and posting of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place designated in the notice of sale. Trustee may postpone sale of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the county treasurer of the county in which the sale took place.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Substitute Trustee.** Lender may, for any reason or cause, from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. **Time of Essence.** Time is of the essence in each covenant of this Security Instrument.

3003L. FRM (08/02)

-6(AZ) (0208)

WELDON, G

Initials

Form 3003 1/01 (rev. 6/02)

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____                    _____ (Seal)
                                                                          Greg Weldon                     -Borrower

_____                    _____ (Seal)
                                                                                                                  -Borrower

_____ (Seal)              _____ (Seal)
                                           -Borrower                                                 -Borrower

_____ (Seal)              _____ (Seal)
                                           -Borrower                                                 -Borrower

_____ (Seal)              _____ (Seal).
                                           -Borrower                                                 -Borrower

3003M. PRM (08/02)                          9389453-                               WELDON, G

-6(AZ) (0208)                              Page 14 of 15                        Form 3003   1/01 (rev. 6/02)

STATE OF ARIZONA,

County ss:

The foregoing instrument was acknowledged before me this October 12 2004
by
Greg Weldon


My Commission Expires:

3-30-2007

Aexa Ramrez

Notary Public



OFFICIAL SEAL
BETH RAMIREZ
NOTARY PUBLIC-ARIZONA
MARICOPA COUNTY
My Comm. Expires March 30, 2007

3003N.FRM (08/02)

9389453-

WELDON, G

-8(AZ) (0208)

Page 15 of 15

Initials

Form 3003 1/01 (rev. 8/02)